IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-1012

Filed 2 July 2024

Forsyth County, No. 22CVD2125

L.I.C. ASSOCIATES I, Limited Partnership, Plaintiff,

v.

BRANDI L. BROWN, Defendant.

Appeal by defendant from order entered 12 August 2022 by Judge Frederick B. Adams in District Court, Forsyth County. Heard in the Court of Appeals 22 August 2023.

> *Legal Aid of North Carolina, Inc., by Frances J. Sullivan, Edward R. Sharp, Isaac W. Sturgill, and Celia Pistolis, for defendant-appellant.*

> *Blanco Tackabery & Matamoros, PA, by Henry O. Hilston, for plaintiff-appellee.*

STROUD, Judge.

Defendant appeals from the trial court's order granting summary judgment in favor of Plaintiff evicting Defendant from the property she leased from Plaintiff. Because Plaintiff's termination notice did not comply with the lease or federal law, the trial court erred by granting summary judgment in favor of Plaintiff but should have granted summary judgment in favor of Defendant.

## I.     Background

On or about 8 August 2014, Defendant Brandi Brown ("Tenant") entered into

a lease with Plaintiff L.I.C. Associates I ("Landlord") for a property in Forsyth County, North Carolina ("the Property"). The Property is managed by Landura Management Associates, which oversees the day-to-day operations of the Property and is responsible for collecting rent and conducting maintenance on behalf of Landlord. Tenant was required to make monthly payments of $27.00 in rent due on the first of each month. The property is federally subsidized by the United States Department of Agriculture ("USDA") Rural Development program, which pays the remaining portion of Tenant's rent.

On or about 15 March 2022, Landlord sent Tenant a "Termination of Lease Notice" ("the Termination Notice") which stated Tenant's lease would be terminated on 15 April 2022 due to late rental payments totaling $111.00 "in accordance with Section 12" of the lease. The Termination Notice also provided Tenant could pay the unpaid balance "prior to the termination date" of 15 April 2022 and the termination would be waived. Further, the Termination Notice identified the Property's management "normal office hours" as Tuesdays and Thursdays between 8:00 AM and 4:00 PM.

After Tenant allegedly failed to "cure" the non-payment of rent, Landlord filed an action for summary ejectment in small claims court on 22 April 2022 alleging only unpaid rent and filed an amended complaint for summary ejectment on 5 May 2022 alleging both unpaid rent and a violation for changing the locks. On 5 May 2022, a magistrate judge entered a "judgment in action for summary ejectment" in favor of

Landlord, ordering Tenant "be removed from and [Landlord] be put in possession" of the Property. Plaintiff timely appealed this judgment to District Court on 9 May 2022. Landlord filed a motion for summary judgment on 26 May 2022.

Landlord contended Tenant violated the lease in two ways: (1) by changing the locks on her door without permission from Landlord or the property management company; and (2) by failing to make timely rental payments in January, February, and March 2022. The relevant provisions of the lease agreement state:

> Section Two – Tenant Contribution
>
> Rent (tenant contribution) . . . is due and payable without demand on or before the first day of each month.
>
> . . . .
>
> If tenant does not pay the full amount of the tenant contribution by the end of the 10th day of the month, a charge of $10 or 5% of Gross Tenant Contribution (whichever is greater) in the amount of $10, will be made for late fee . . . and/or the landlord may terminate this agreement for nonpayment of rent in accordance with state law.
>
> . . . .
>
> Section Eight – Use and Maintenance
>
> . . . .
>
> Tenant agrees:
>
> . . . .
>
> 10. Not to make any alteration, addition, deletion, or improvements to the premises without the prior written consent of landlord.

. . . .

Section Twelve – Termination of Lease

. . . .

Landlord may terminate this lease agreement, with proper notice, for the following reasons:

. . . .

2. Tenant's material noncompliance with the terms of the lease such as, but not limited to[:] (a) nonpayment of rent past a 10-day grace period; (b) nonpayment of any other financial obligations beyond the required date of payment; (c) repeated late payment of rent or other financial obligations; (d) admission to, or conviction of, any drug violations as defined in Section 18; (e) permitting unauthorized persons to live in the unit; (f) repeated minor violations of the lease; (g) one or more major violations of the lease.

(Capitalization altered.) The lease also refers to "Rules and Regulations" in an attachment to the lease, which state:

13. The Landlord may retain a pass key to the premises. Tenant shall not alter any lock or install new locks without the written consent of the Landlord.

. . . .

18. All maintenance requests shall be given to the Landlord in writing with the exception of emergencies. The landlord will provide a "Tenant Maintenance Request" (TMR) form for reporting maintenance requests.

(Capitalization altered.)

At the hearing in District Court, Landlord presented the affidavit of Tiffany McKenzie, the property manager for Landlord, supporting the motion for summary

judgment and Tenant filed an affidavit in opposition. Essentially, Landlord alleged Tenant did not pay rent for January, February, and March 2022, and never "cured" the non-payment of rent by paying before 15 April 2022, as allowed in the Termination Notice. Tenant disputed this, stating she tried to pay the unpaid rent on 14 April 2022, but no one was in the leasing office to take her payment. Further, Landlord claimed Tenant changed the locks without permission in violation of the lease, failed to change the locks back after a written notice to do so, and never provided Landlord with the key to the new lock. Tenant claimed she changed the locks due to her ex-boyfriend stealing her key. She contended she attempted to contact Landlord multiple times to change the locks; she did not receive a notice alleging she violated her lease by changing the locks; she asked for help from Landlord in changing the locks back once she became aware of the issue; and she provided the new key to the locks to Landlord.

After an 8 July 2022 hearing on the motion for summary judgment, the trial court entered an order on 12 August 2022 granting summary judgment in favor of Landlord. Tenant appeals.

## II.    Mootness

While Tenant's appeal was pending with this Court, Tenant failed to make timely rental payments as ordered by the stay of execution. As a result, Landlord filed a motion to dismiss the appeal as moot. Specifically, as Landlord regained possession of the Property due to Tenant's failure to pay rent, Landlord contends

there is no longer a live issue. Tenant responds that because she has various statutory remedies based upon North Carolina General Statute Sections 42-35 and 42-36 available if she should win on appeal, the appeal is not moot.

We have consistently held "[a] case is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." *Ass'n for Home and Hospice Care of N.C., Inc., v. Div. of Med. Assistance*, 214 N.C. App. 522, 525, 715 S.E.2d 285, 287-88 (2011) (citations and quotation marks omitted). Further, "if the issues before a court or administrative body become moot *at any time during the course of the proceedings*, the usual response should be to dismiss the action." *Id.* at 526-27, 715 S.E.2d at 289 (emphasis in original) (citations and quotation marks omitted).

Tenant cites to an unpublished case to support the proposition that an appeal of an eviction is not moot where the landlord regains possession of the premises due to the tenant's subsequent failure to pay rent as ordered by a stay of execution. *See River Hills Apartments v. Hardy*, No. COA04-1009, 168 N.C. App. 729, 609 S.E.2d 499 (2005) (unpublished). In *River Hills Apartments*, this Court held "the clerk's issuance of a writ of possession or the removal of defendant from the subject apartment [does not] moot [tenant's] appeal *from the magistrate's judgment,* given the statutory remedies [under North Carolina General Statute Sections 42-35 and 42-36] available to her should she prevail." *Id.*, slip op. at 3 (emphasis added). *River Hills Apartments* deals not with an appeal to this Court, but with the appeal from the

magistrate to District Court for trial *de novo,* so *River Hills Apartments'* usefulness as persuasive authority is limited.  In addition, we have been unable to find any case defining what a claim under North Carolina General Statute Sections 42-35 or 42-36 would require.  These statutes were adopted in 1868 but only one reported appellate case has mentioned them. In *Twin City Apartments, Inc. v. Landrum,* the statutes are mentioned, although there were no claims in the case based upon them.  45 N.C. App. 490, 494, 263 S.E.2d 323, 325-26 (1980).  These statutes were briefly mentioned in *Twin City Apartments* in this Court's discussion of whether "the summary ejectment procedure as set out in G.S. 42-26(1) and G.S.42-32, is unconstitutional[,]" stating

> [o]nce the estate of the lessee expires, the lessor, by virtue of his superior title, may resume possession by following proper procedures. Defendant's right to possession is protected by virtue of G.S. 42-35 and G.S. 42-36, *which provide a remedy to the tenant if he is evicted, but later restored to possession.*

*Id*. at 494, 263 S.E.2d at 325-26 (emphasis added).  This Court did not interpret the statutes or discuss them any further.  *Id.*

The only cases addressing a right of restitution or repossession as mentioned in these statutes are cases from the 1800s and as best we can tell these cases were

based upon common law[1] or former North Carolina statutes. *See, e.g., Dulin v. Howard*, 66 N.C. 433, 435 (1872) ("In addition, this duty is expressly prescribed by sec. 27 of the Landlord and Tenant, Act 1868-69, ch. 156, p. 355."). But despite the apparent lack of use of these statutes since their adoption in 1868, the statutes have not been revoked or amended, despite many changes to Chapter 42 over the years.

North Carolina General Statute Section 42-35 states:

> If the proceedings before the magistrate are brought before a district court and quashed, or judgment is given against the plaintiff, the district or other court in which final judgment is given shall, if necessary, restore the defendant to the possession, and issue such writs as are proper for that purpose.

N.C. Gen. Stat. § 42-35 (2023). North Carolina General Statute Section 42-36 states

---

[1] "When adopted in 1778, before the existence of the United States of America, current N.C.G.S. § 4-1 reaffirmed principles relating to the common law which had first been statutorily recognized for the Colony of North Carolina in 1715. N.C.G.S. § 4-1 provides:

> All such parts of the common law as were heretofore in force and use within this State, or so much of the common law as is not destructive of, or repugnant to, or inconsistent with, the freedom and independence of this State and the form of government therein established, and which has not been otherwise provided for in whole or in part, not abrogated, repealed, or become obsolete, are hereby declared to be in full force within this State.

N.C.G.S. § 4-1 (1986). This statute appears to have survived without amendment for the 221 years from its enactment to this date. The common law to be applied in North Carolina is the common law of England to the extent it was in force and use within this State at the time of the Declaration of Independence; is not otherwise contrary to the independence of this State or the form of government established therefore; and is not abrogated, repealed, or obsolete. The common law that remains in force by virtue of N.C.G.S. § 4-1 may be modified or repealed by the General Assembly, except that any parts of the common law which are incorporated in our Constitution may be modified only by proper constitutional amendment."

*Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 471-72, 515 S.E.2d 675, 690-91 (1999) (citations and quotation marks omitted).

"[i]f, by order of magistrate, the plaintiff is put in possession, and the proceedings shall afterwards be quashed or reversed, the defendant may recover damages of the plaintiff for his removal."  N.C. Gen. Stat. § 42-36 (2023).

Based on these statutes providing Tenant with potential statutory remedies, we cannot say further litigation "cannot have any practical effect on the existing controversy."  *Div. of Med. Assistance,* 214 N.C. App. at 525, 715 S.E.2d at 288; *see id.* Thus, we hold this appeal is not moot and deny the motion to dismiss the appeal.

### III.    Defective Termination Notice

Tenant raises several arguments on appeal, including arguments that the trial court erred in granting summary judgment because there were genuine issues of material fact as to whether she tendered payment of rent and her violation of the lease as to changing the locks.  But since we have determined the defects in the Termination Notice are dispositive, we will limit our opinion to these arguments.

Tenant argues "the trial court erred in granting summary judgment for [Landlord] rather than [Tenant] when the termination of lease notice did not provide the notices required by the lease and federal law, including the Violence Against Women Act."  Specifically, Tenant claims the Termination Notice is defective since it "does not inform [Tenant] of her right to access her tenant file, as required by the Lease, and does not include a notice of VAWA [Violence Against Women Act] rights or a VAWA certification form, as required by 34 U.S.C. § 12491(d)(2)(c)."

#### 1. *Notice Based on the Lease*

First, Tenant contends Landlord's "termination of lease notice does not comply with the lease[,]" (capitalization altered), since the Termination Notice "does not mention the locks at all, much less identify that alleged violation as a basis for the proposed termination of the lease." As to non-payment of rent, Tenant argues "the [Termination] Notice does not offer [Tenant] access to her file, which her Lease requires."

> A trial court's findings of fact in a bench trial have the force of a jury verdict and are conclusive on appeal if there is competent evidence to support them, even though there may be evidence that would support findings to the contrary. However, conclusions of law reached by the trial court are reviewable de novo.
>
> In order to evict a tenant in North Carolina, a landlord must prove: (1) That it distinctly reserved in the lease a right to declare a forfeiture for the alleged act or event; (2) that there is clear proof of the happening of an act or event for which the landlord reserved the right to declare a forfeiture; (3) that the landlord promptly exercised its right to declare a forfeiture, and (4) that the result of enforcing the forfeiture is not unconscionable.
>
> Our courts do not look with favor on lease forfeitures. When termination of a lease depends upon notice, the notice must be given in strict compliance with the contract as to both time and contents.

*Lincoln Terrace Assocs., Ltd. v. Kelly*, 179 N.C. App. 621, 623, 635 S.E.2d 434, 435-36 (2006) (citations, quotation marks, and brackets omitted).

Here, the lease required:

> Landlord must give Tenant a written notice of any proposed termination of tenancy, stating the grounds for

termination, allowing Tenant or his designee access to his file, giving a specific date of the termination and advising the Tenant of their right to defend himself if judicial action is needed. Except as may otherwise be stated, and in accordance with Agency regulations, state or local laws, the above notice shall give at least 10 days for nonpayment of rent, and 30 days in the case of material non compliance.

The Termination Notice was written; identified the date of termination and amount of rent past due; stated the grounds for termination under Section 12 of the lease; and stated judicial action may be taken if Tenant failed to vacate and that Tenant "may present a defense" at that time. However, the Termination Notice only identifies the grounds for termination as "Non-Payment of Rent" "in accordance with Section 12 of [the] lease[,]" which deals with termination of the lease generally including non-payment of rent and "material non compliance," among other things. While the Termination Notice sufficiently explains to Tenant her ability to "contact the office to arrange a meeting to discuss the proposed termination[,]" which satisfies Landlord's obligation to give Tenant access to her file, the Termination Notice does not comply with the lease as to the lock violation.

This Court has held a termination notice that required the landlord to identify the specific grounds for termination but identified the wrong section of the lease as the basis for termination nonetheless was in strict compliance with the lease. *See Roanoke Chowan Reg'l Hous. Auth. v. Vaughan*, 81 N.C. App. 354, 358, 344 S.E.2d 578, 581 (1986). In *Vaughan*, the termination notice stated the grounds for termination was "Section 7 of Lease Agreement[:] by allowing individuals not named

- 11 -

on the lease to reside in your apartment." *Id*. at 356, 344 S.E.2d at 580. But section 7 was not the correct section to terminate the lease for "allowing individuals not named on the lease to reside in your apartment." *Id*. at 358, 344 S.E.2d at 581. Despite this error, this Court held, since the termination notice still identified the ground for termination, "[t]his statement controls and is sufficient to put defendants on notice regarding the specific lease provision deemed to have been violated." *Id*.

In contrast to our holding in *Vaughan*, here the Termination Notice was titled "Termination of Lease Notice[:] Non-Payment of Rent" and specifically states the lease will be terminated "because you failed to pay your rent[.]" While the Termination Notice identifies section 12 of the lease as the basis for termination, section 12 includes non-payment of rent and six other potential bases for termination. As the Termination Notice itself specifically identifies only non-payment of rent as the basis for termination, and does not mention locks or material non-compliance with the lease, the Termination Notice regarding the lock violation is not in strict compliance with the lease. *See id*. We also note Landlord argues the prior written warnings regarding the lock, together with the Termination Notice, are sufficient to comply with the notice requirement. But Landlord cannot rely upon the prior warnings as an addition to the Termination Notice. These warnings are clearly labeled "Tenant Warning" and stated "[s]hould you fail to take this corrective action or if additional violations of the lease occur, action will be taken, up to and including the termination of your lease." As these warnings did not state Landlord was

terminating the lease for the lock violation, the warnings cannot serve as proper termination notices. Thus, the Termination Notice is defective under the lease as to the lock violation.

### 2. *Notice Under the Violence Against Women Act*

In addition to alleging a defective notice under the lease, Tenant contends her lease is covered under a federally subsidized housing program and thus the Violence Against Women Act ("VAWA") "require[s] a notice of rights and a VAWA certification form to be included with any notice of lease termination."

The issue of whether Landlord complied with "applicable rules and regulations" in the termination of the lease is a question of law which we review *de novo*:

> In federally subsidized housing cases, the court decides whether applicable rules and regulations have been followed, and whether termination of the lease is permissible. The construction of an administrative regulation is a question of law. On appeal, conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo*.

*Raleigh Hous. Auth. v. Winston*, 376 N.C. 790, 794, 855 S.E.2d 209, 212 (citations, quotation marks, and brackets omitted).

Under VAWA:

> Each public housing agency *or owner or manager of housing* assisted under a covered housing program *shall provide the notice* developed under paragraph (1), together with the form described in subsection (c)(3)(A), to . . . tenants of housing assisted under a covered housing

- 13 -

program—

. . . .

    (c) with any notification of eviction or notification of termination of assistance[.]

34 U.S.C. § 12491(d)(2)(c) (2022) (emphasis added).

Here, Landlord does not dispute that VAWA requires landlords of a federally subsidized housing program to include a notice of VAWA rights in a notice of lease termination but asserts the VAWA statute does not provide a remedy for non-compliance, such as a defense to an eviction. Landlord points us to a Department of Housing and Urban Development ("HUD") regulation, 24 C.F.R. § 5.2005, that Landlord contends is applicable, to argue non-compliance with a notice requirement in an eviction proceeding is not a defense available to Tenant since Tenant's eviction was "unrelated to domestic violence." *See* 24 C.F.R. § 5.200(d)(2) ("Nothing in this section limits any available authority of a covered housing provider to evict or terminate assistance to a tenant for any violation not premised on an act of domestic violence, dating violence, sexual assault, or stalking that is in question against the tenant or an affiliated individual of the tenant."). In addition, this Court has addressed notice of termination requirements under other provisions of similar federal statutes governing federally subsidized housing programs. *See Timber Ridge v. Caldwell*, 195 N.C. App. 452, 455, 672 S.E.2d 735, 737 (2009) (reversing "the trial court's grant of summary ejectment" since "there is no evidence in the record in the

present case that plaintiff complied with the requirements of 24 C.F.R. § 247.4 by providing a proper Notice of Termination").

Although we are unable to find binding North Carolina authority addressing VAWA specifically, our Supreme Court has held a landlord's non-compliance with regulations regarding the notice of termination in an eviction action in housing covered by a federally subsidized housing program merits reversal of judgment in favor of a landlord. *See Winston*, 376 N.C. at 797, 855 S.E.2d at 214 (reversing "the Court of Appeals' decision concerning compliance with 24 C.F.R. § 966.4(*l*)(3)(ii) and remand[ing] to the Court of Appeals for remand to the trial court for dismissal" since the landlord's termination notice did not comply with federal regulations). In *Winston*, the specific issue was based upon the landlord Raleigh Housing Authority's notice of lease termination to the tenant, Winston, that "notified her of RHA's intent to terminate her lease due to 'Inappropriate Conduct – Multiple Complaints' and quoted provision 9(F) of the lease agreement." *Id.* at 791, 855 S.E.2d at 211. The termination notice did not identify the specific conduct RHA claimed as "inappropriate conduct" under the lease. *See id.* In the lease agreement, provision 9(F) required the tenant to "[t]o conduct himself/herself and cause other persons who are on the premises with the Resident's consent to conduct themselves in a manner which will not disturb the neighbors' peaceful enjoyment of their accommodations." *Id.* at 796, 855 S.E.2d at 213. RHA argued Winston was "on notice that her alleged lease violation was based on disturbing her neighbors." *Id.* The Supreme Court noted

that "a tenant's disturbance of her neighbors encompasses a broad range of conduct, may involve the tenant or other persons on the premises, and, as relevant to this case, may include conduct for which the landlord may not evict the tenant as a matter of law." *Id.* Based on the trial court's findings of fact, the alleged "inappropriate conduct" arose from several noise complaints from Winston's neighbors. *Id.* at 793, 855 S.E.2d at 212. The trial court found Winston had claimed she was going to seek a Domestic Violence Protective Order ("DVPO") against a man, although no DVPO had been granted, and she had alleged the man "repeatedly screams profanity at [Winston] and threatens to assault her; repeatedly verbal abuse for 17 years has caused her substantial emotional distress[.]" *Id.* at 793, 855 S.E.2d at 212. Although the Supreme Court's holding was based upon RHA's failure to state the "specific grounds" for the termination of the lease as required by 24 C.F.R. § 966.4(l)(3)(ii), the Court also noted that Winston's alleged "disturbance of her neighbors" might include "conduct for which the landlord may not evict the tenant as a matter of law," noting provisions of VAWA:

> Specifically, as part of the Violence Against Women Act, ch. 322, 108 Stat. 1902 (1994), Congress has prohibited covered housing programs from terminating participation in or evicting a tenant from housing on the basis that the tenant is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, 34 U.S.C. § 12491(b)(1), and mandates that
>
> an incident of actual or threatened domestic violence, dating violence, sexual assault, or stalking shall not be construed as—

> (A) a serious or repeated violation of a lease for housing assisted under a covered housing program by the victim or threatened victim of such incident; or
>
> (B) good cause for terminating the assistance, tenancy, or occupancy rights to housing assisted under a covered housing program of the victim or threatened victim of such incident.
>
> 34 U.S.C. § 12491(b)(2); *see also* N.C.G.S. § 42-42.2 (2019) (prohibiting termination of tenancy or retaliation in the rental of a dwelling based substantially on: (i) the tenant, applicant, or a household member's status as a victim of domestic violence, sexual assault, or stalking). The additional statement in the notice of termination – "Inappropriate Conduct – Multiple Complaints" – is similarly broad and vague and subject to the same concerns as provision 9(F) of the lease agreement.

*Id.* at 796-97, 855 S.E.2d at 214 (quotation marks, ellipsis, and brackets omitted).

In this case, although the trial court did not make any findings of fact but instead granted summary judgment for Landlord, we note Tenant's affidavit stated she had changed the locks because her "ex-boyfriend stole [her] keys to the Leased Premises" and she had attempted several times to get Landlord's Property Manager to change the locks. After she was unable to get assistance from Landlord, she changed the locks.[2] We are thus unable to say, as Landlord contends, that the changed locks violation was "unrelated to domestic violence."

---

[2] Had we addressed the issue of whether there were genuine issues of material fact precluding summary judgment in favor of Landlord, we would have reversed based on a factual dispute in the affidavits from Tenant and Landlord as to Tenant's requests to change the locks and Landlord's response. But we note the issue of the changed locks because Tenant's alleged need to change her locks also arose from a situation of the type VAWA is intended to address, just as in *Winston. See Winston*, 376 N.C. at 796-97, 855 S.E.2d at 214.

Because Landlord failed to comply with the VAWA termination notice requirements, and Tenant's housing assistance is indisputably covered by VAWA, we must reverse the trial court's grant of summary judgment in favor of Landlord and remand to the trial court for dismissal of the eviction proceeding. *See id.* at 794, 855 S.E.2d at 212 ("We reverse the decision of the Court of Appeals on the first issue presented and remand to the trial court for dismissal.").

## IV.    Conclusion

Because Landlord failed to comply with the notice requirements under the lease as to the lock violation and under VAWA in the termination notice, we reverse the trial court's grant of summary judgment in favor of Landlord and remand to the trial court for dismissal.

REVERSED AND REMANDED.

Judge FLOOD concurs.

Judge STADING concurs in result only.